**FILED**
**Jun 08, 2021**
**12:27 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT KNOXVILLE

| | | |
|---|---|---|
| **SAMUEL BARNETT,** | ) | **Docket No 2016-03-1371** |
| **Employee,** | ) | |
| **v.** | ) | |
| **PC METRO BOTTLING,** | ) | **State File No. 21235-2015** |
| **Employer,** | ) | |
| **And** | ) | |
| **AGRI-GENERAL INS. CO.,** | ) | **Judge Robert Durham** |
| **Carrier.** | ) | |

---

### COMPENSATION HEARING ORDER GRANTING BENEFITS

---

The Court held a Compensation Hearing on May 21, 2021, to determine the appropriate impairment rating to use in assessing Mr. Barnett's vocational disability and whether he is entitled to additional permanent partial disability benefits under Tennessee Code Annotated section 50-6-242. The Court holds that the correct impairment rating is that of the Medical Impairment Rating Registry (MIRR) doctor, Dr. Jeffrey Uzzle, or twenty-five percent to the body as a whole, and that Mr. Barnett is not entitled to additional benefits.

### History of Claim

The parties agreed that Mr. Barnett sustained a compensable low-back injury while working at PC Metro on March 16, 2015.[1] During his initial care, an MRI revealed a L4-5 bilateral disc bulge that encroached upon the L5 nerve roots, left greater than right, although it did not mention radiculopathy. PC Metro ultimately authorized care with orthopedist Patrick Bolt, M.D.

---

[1] The parties also agreed to the following: Mr. Barnett's compensation rate is $591.79; PC Metro overpaid temporary disability benefits in the amount of $1,967.84 and paid $5,306.25 as an advance against permanent partial disability benefits, for a total credit of $7,358.99; and, Mr. Barnett was unable to return to his pre-injury position with PC Metro, which entitles him to benefits beyond his initial compensation period.

1

Dr. Bolt provided conservative care for a herniated disc with radiculopathy. He did not believe surgery was warranted. After months of treatment, Dr. Bolt noted Mr. Barnett continued to complain of significant low-back pain, but he felt his radiculopathy had resolved. He placed Mr. Barnett at maximum medical improvement and released him with light-duty restrictions and a seven-percent impairment rating.

Mr. Barnett continued to suffer from back pain, so he obtained an independent medical examination with Dr. William Kennedy, who gave a twenty-seven percent impairment rating. PC Metro eventually authorized Mr. Barnett to return to Dr. Bolt in April 2017. Dr. Bolt confirmed his diagnosis of a resolved radiculopathy and referred Mr. Barnett to a neurosurgeon.

PC Metro authorized neurosurgeon David Hauge to treat Mr. Barnett. He determined Mr. Barnett needed surgery. Afterward, Dr. Hauge noted Mr. Barnett still complained of low-back and bilateral hip pain. A functional capacity exam showed an ability to work under "medium" work restrictions.

At the hearing, the parties introduced disparate evidence from the various medical experts, as well as Mr. Barnett, summarized below.

*Dr. Uzzle's report*

Due to the competing ratings, Mr. Barnett sought an opinion from the Bureau's Medical Impairment Rating Registry with physiatrist Dr. Uzzle. Dr. Uzzle did not testify in person, nor was he deposed by the parties. The parties agreed to submit his MIRR report to the Court for consideration.

Mr. Barnett told Dr. Uzzle that he suffered an immediate onset of low-back pain with bilateral radiculopathy after his 2015 work injury. As for his current condition, Mr. Barnett identified low-back pain as his chief complaint, but he said he still suffers from intermittent numbness in both legs.

On exam, Dr. Uzzle noted atrophy in Mr. Barnett's left thigh and right calf, which he felt could be attributed either to Mr. Barnett's previous surgeries or his bilateral radiculopathy.[2] Mr. Barnett showed limited range of motion in his lumbar spine, but Dr. Uzzle did not observe any spasms or positive straight leg test results. Muscle strength and reflexes were normal except for absent bilateral hamstring reflexes; he did not detect any foot drop or plantar flexion weakness. Sensory exams, which included "monofilament, light touch, and sharp sensation testing," showed a mild sensory decrease in the top of both feet along the L5 dermatome.

---

[2] All the other doctors who testified felt that the atrophy was due to Mr. Barnett's previous surgeries and not his back injury.

2

In his report, Dr. Uzzle diagnosed Mr. Barnett with "chronic low back pain S/P injury treated surgically at L4/5. Bilateral non-severe L5 radiculopathy, sensory deficit without motor deficit." On the key issue of impairment, Dr. Uzzle explained that Mr. Barnett could fit in either Class 2 or 4 of Table 17-4 of the AMA Guides. He noted that Class 2 is for single level involvement with radiculopathy, but the description does not clarify whether Class 2 applies if the radiculopathy is bilateral rather than unilateral. He stated that Class 4 "includes multiple level involvement and residual bilateral radiculopathy." He admitted that neither class was a "perfect fit," but given Mr. Barnett's history, examination findings, and physical limitations, he felt a Class 4 twenty-five percent impairment was the better choice.

*Dr. Hauge's deposition*

After receiving Dr. Uzzle's report, the parties deposed Dr. Hauge. He testified that during his initial evaluation, he found a "mild, broad-based L4-5disc protrusion with moderate to severe central canal stenosis." Mr. Barnett showed signs of radiculopathy in his left leg, as defined by the Guides, but he only complained of non-verifiable radicular complaints on the right side.

During Mr. Barnett's surgery, Dr. Hauge noted a "large engorgement" of veins on the right side around the protruding disc material, which he had to reduce and remove. He also found the ligament surrounding the disc to be significantly worn on the right side and, after opening it, he removed "multiple disrupted disc fragments" from the spinal canal. He felt these fragments were due to an acute disc injury. In addition, he removed a right synovial cyst that he believed was due to injury and was likely causing back pain. These actions resulted in a "good decompression" of the right L4-5 nerve root.

Dr. Hauge decompressed the left L4-5 nerve root as well but did not find as much damage as on the right. He admitted this appeared contrary to Mr. Barnett's complaints but explained that he had no idea how the protrusion impinged on the nerves when Mr. Barnett was standing or sitting. Finally, he installed a stabilization device at the L4-5 level.

After surgery, Dr. Hauge's records stated that Mr. Barnett continued to suffer from low-back pain, although it was not as severe. He also had non-verifiable radicular complaints on the left side, but his radicular complaints on the right had resolved.

Regarding impairment, Dr. Hauge placed Mr. Barnett in Class 1 of Table 17-4 of the Guides because the herniation was at a single level. Dr. Hauge stated that he "strongly" disagreed with Dr. Uzzle's Class 4 placement. He explained that Mr. Barnett did not reach Class 3 or 4 because his herniation was at a single-disc level. In addition,

3

he disagreed with Dr. Uzzle's diagnosis of right-sided radiculopathy. He saw no evidence of it and testified that even if Dr. Uzzle's finding of right sensory loss were accurate, it would not constitute radiculopathy under the Guides.

Dr. Hauge agreed that the baseline for a Class 1 impairment is seven percent, but he used modifiers to increase the impairment to nine. He agreed that nine percent was probably inappropriate under the Guides, and he would not place Mr. Barnett at anything less than seven percent or more than eight.

When asked about testing for radiculopathy, Dr. Hauge stated that he did not do a test for "sharp vs. dull" sensory limitations, because very few evaluators do so. Instead, he tests for a decreased pinprick sensation versus what the patient reports in normal adjacent dermatomes.

Regarding Dr. Uzzle's report, he agreed that Dr. Uzzle did not note any findings of radiculopathy other than reports of sensory changes, and Dr. Uzzle did not use a "sharp vs. dull" test. He stated that Dr. Uzzle's findings of numbness in both legs differed from his findings and acknowledged that these tests are partially subjective.

Under cross, Dr. Hauge admitted that his surgical report noted bilateral lumbar radicular pain pre-operatively as well as post-operatively. He further testified that he had not been through any training dedicated to providing impairment ratings under the Guides. He stated he had no reason to doubt Mr. Barnett's truthfulness or compliance. Finally, Dr. Hauge completed a physician certification form stating that Mr. Barnett's permanent restrictions kept him from returning to his job at PC Metro.

*Mr. Barnett's testimony*

Mr. Barnett testified he was twenty-five years old at the time of his injury and, before hurting his back, was extremely active. He played sports in several recreational leagues, worked out regularly, and coached his son's basketball team.

In 2015, he hurt his back at PC Metro. He felt immediate low back pain, which radiated to both legs, more in the left. The back pain was severe, with numbness and tingling down to his feet. Certain activities worsened his symptoms. For example, sitting on the commode would cause complete numbness in his left leg and severe tingling on the right.

The severe pain and numbness were constant until Mr. Barnett's surgery in 2018. Since then, he still experiences low back pain but not as severe. He still suffers from intermittent numbness, greater on the left than the right. Going to the bathroom and walking uphill causes it. Sitting more than an hour causes severe back pain and left-leg numbness. His significant lifting restrictions prevent his participation in sports, including

4

playing and coaching his son, or exercise beyond occasional walks. He cannot perform household chores, such as laundry or vacuuming, like he did before.

For the last two years, Mr. Barnett has worked a sedentary job with another employer. He thinks he makes $13.75 per hour, or approximately sixty percent of his pre-injury wages.

*Dr. Kennedy's testimony*

Dr. Kennedy performed an independent medical evaluation and testified at the hearing. He is an orthopedic surgeon who practiced for twenty-six years before providing evaluations full-time. In his practice, he regularly performed back surgeries. Dr. Kennedy is currently certified as an independent medical examiner and is on the Medical Impairment Rating Registry. Both require training in using the Guides to evaluate impairment.

Dr. Kennedy evaluated Mr. Barnett and found him to be truthful and compliant. Given Mr. Barnett's history and the MRI films, he believed Mr. Barnett suffered from an L4-5 disc herniation with bilateral radiculopathy. Dr. Uzzle pointed out the herniation and the corresponding "crowding" of the nerve roots in the 2015 MRI film.

Using the 2018 MRI image, Dr. Kennedy demonstrated how the herniation worsened since 2015. He felt the 2018 MRI showed a "clear picture" of bilateral nerve root impingement that was consistent with Mr. Barnett's radicular symptoms. He further noted that radiculopathy could be due to "chemical" damage to the nerve caused by the breakdown of the disc, as well as actual impingement from the herniation.

When Dr. Kennedy examined Mr. Barnett, he noted reflex loss and atrophy, but he agreed with the other physicians that these were not likely to be due to the work injury. However, Mr. Barnett complained about numbness in both feet that was consistent with radiculopathy. On testing, Dr. Kennedy found sensory loss in the L5 dermatome in both legs as well as in the S1 dermatome on the left, which he believed was evidence of continuing radiculopathy from Mr. Barnett's 2015 injury. Dr. Kennedy stated that his testing procedures and conclusions were essentially the same as Dr. Uzzle's, except that he also noted radiculopathy at S1.

In testing sensory loss, Dr. Kennedy emphasized listening to the patient's symptom description but stated it cannot be solely relied upon since many patients are poor descriptors. Thus, he also tests sensory loss in a variety of ways, such as light touch and sharp versus dull. He tests not only the suspected dermatome but also along adjacent dermatomes and parallel dermatomes on the unaffected side for comparison. He also repeats each test several times to ensure consistency. In Mr. Barnett's case, Dr. Kennedy found changes bilaterally in the L4-5 dermatome as well as the left S1 dermatome.

However, he noted that Mr. Barnett could still differentiate between sharp and dull sensations.

Dr. Kennedy said that he saw no deficiencies as to the methods Dr. Uzzle used to determine radiculopathy, particularly regarding sharp versus dull sensations. He noted the Guides do not mention an inability to differentiate between sharp and dull sensations as a sign of verifiable radiculopathy. Dr. Kennedy stated that that, in his opinion, the MRI films, his findings, Dr. Uzzle's findings, and the operative report all supported verifiable, bilateral radiculopathy under the Guides. He did not think that his finding of left S1 radiculopathy, while Dr. Uzzle did not find that, was a significant difference, given that dermatomes often overlap.

As for impairment, Dr. Kennedy believed the descriptions in Table 17-4 are insufficient to cover Mr. Barnett's situation. He agreed that Class 4 states it applies when there are multiple herniations, but he believed that it is also the appropriate class if bilateral radiculopathy is present at a single level. He pointed out that no other class includes bilateral radiculopathy in its description. Thus, Class 4, which is the only one that covers radiculopathy at more than one dermatome, was appropriate.

He acknowledged that impairment rating was slightly higher than Dr. Uzzle's but attributed this difference to the weight given to the modifiers. He did not disagree with Dr. Uzzle's rating.

On cross, Dr. Kennedy acknowledged that his testimony on direct was erroneous when he said the medical records immediately after Mr. Barnett's injury showed that he complained of radiculopathy. He also agreed that Dr. Hauge only described left radicular complaints, and Dr. Hauge believed Mr. Barnett's radicular complaints resolved based on a negative pinprick test. However, Dr. Kennedy disagreed with Dr. Hauge's conclusion.

Dr. Kennedy conceded that, during his exam, Mr. Barnett did not have other symptoms of radiculopathy such as reflex loss, loss of strength or a positive straight leg raise test. Nevertheless, he insisted that Mr. Barnett's radicular sensory complaints were objective because they matched well-known dermatomal patterns, and the MRIs showed significant bilateral nerve root compression before surgery.

*Dr. Hazlewood's deposition*

PC Metro offered Dr. Jeffrey Hazlewood's testimony to support its position. Dr. Hazlewood is a physiatrist specializing in pain management and has treated back patients for twenty-five years. He is board-certified in both pain management and physiatry and certified by the Bureau's Medical Impairment Registry to provide impairment ratings. He was the Bureau's assistant Medical Director from 2014 through 2017 and for the last several years has been an instructor for the Bureau training doctors to provide

6

impairments using the Guides.

Dr. Hazlewood stated that the first step in determining impairment for lumbar spine injuries is deciding whether the patient suffered a disc herniation. Dr. Hazlewood pointed out that in a footnote to Table 17-4, the Guides states that the definition of "herniation" excludes a herniation on imaging that is not accompanied by "consistent objective findings" of radiculopathy.

He explained that, if a patient has a herniation with radiculopathy, they belong in the "motion segment lesion" category of Table 17-4. The evaluator must then determine which class they belong in. The evaluator must determine whether the radiculopathy resolved, and if so, whether the patient continues to suffer from non-verifiable radicular complaints. Once these questions have been answered, the evaluator may then determine the appropriate class.

Dr. Hazlewood explained that the "radiculopathy" necessary to decide impairment is often different from the "radiculopathy" used for diagnosis. He quoted page 576 of the Guides, which states that imaging studies consistent with a condition that might cause radiculopathy are not enough. The patient must also exhibit clinical findings of pain, numbness, and paresthesia along the anticipated dermatomal pattern. The Guides further say that since subjective complaints are difficult to assess, they should be consistent and supported by other signs of radiculopathy, such as motor weakness, reflex loss, or a positive straight leg raise test.

In addition, page 576 defines "non-verifiable radicular complaints" as "symptoms of pain and numbness in a single nerve root distribution, but which has preserved sharp versus dull sensation and muscle strength, is not significantly compressed on imaging, and is unaffected on electrodiagnostic studies."

Given these definitions, Dr. Hazlewood believed that simply noting a difference between "dull" and "sharp" sensations along the affected dermatome when compared to a normal one is insufficient to determine radiculopathy as defined by the Guides.

Dr. Hazlewood then explained his history with Mr. Barnett's claim. He first became involved when he provided a record review in 2017, before Dr. Hauge's surgery, and he gave a zero-percent rating. After the surgery and Dr. Uzzle's evaluation, he saw Mr. Barnett for an independent medical evaluation and concluded that Mr. Barnett never suffered from a herniation. He placed him in Class 1 of the "soft tissue" category of Table 17-4 and gave him a two-percent impairment.

At trial, Dr. Hazlewood testified that, after reviewing Dr. Hauge's operative report, he believed Mr. Barnett did suffer from a ratable L4-5 disc herniation. This places him in the "motion segment lesion" category of Table 17-4. Moreover, he also believed

the records could support a diagnosis of left L4-5 radiculopathy that resolved by surgery, even though no objective signs of radiculopathy were noted before surgery. Thus, he agreed with placing Mr. Barnett in Class 1.

Dr. Hazelwood strongly disagreed with Dr. Uzzle's and Dr. Kennedy's placement of Mr. Barnett in Class 4. Although he admitted that nothing in the Guides addresses bilateral radiculopathy at one level, he maintained that Class 4 only applies to multiple disc herniations, and Mr. Barnett's herniation was at a single level.

He also did not believe that Mr. Barnett currently suffers from objective signs of radiculopathy, since no doctor stated that Mr. Barnett could not discern between sharp versus dull sensations or found that he suffered from other signs of radiculopathy. In addition, Dr. Hazlewood noted that reports from various physicians documenting Mr. Barnett's complaints have been inconsistent throughout as to the presence and location of his numbness.

Finally, Dr. Hazlewood testified that even if Mr. Barnett suffers from bilateral radiculopathy, he would not qualify for Class 4. He believed that Class 4 should be reserved for the most serious cases of disablement, as illustrated by the example on page 587 of the Guides. He stated that Mr. Barnett does not fit that scenario.

## Findings of Fact and Conclusions of Law

Mr. Barnett has the burden of proving the essential elements of his workers' compensation claim by a preponderance of the evidence. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). However, in this case, the parties have stipulated to all but one issue— Mr. Barnett's permanent disability from his work-related injury.

To answer this question, the Court must determine whether PC Metro rebutted the statutory presumption afforded to Dr. Uzzle's impairment rating by clear and convincing evidence, and if not, whether Mr. Barnett is entitled relief under Tennessee Code Annotated § 50-6-242.

In Tennessee, a permanent disability award depends on the employee's impairment rating under the American Medical Association's Guide to the Evaluation of Anatomic Impairment, 6th edition. Tenn. Code Ann. § 50-6-204(k). However, the Guides are often open to interpretation, which leads to differing impairment opinions.

To resolve these differences, the legislature created the Medical Impairment Rating Registry (MIRR). Tenn. Code Ann. § 50-6-204(d)(5). When there is a dispute as to impairment rating, the parties may choose a neutral physician from the MIRR panel who is trained in assessing impairment under the Guides. This doctor's impairment

rating is presumed correct, and the presumption may only be overcome by clear and convincing evidence. *Id.*

The Supreme Court has defined "clear and convincing evidence" to mean the evidence is so clear that "there is no serious or substantial doubt about the correctness of the conclusions to be drawn from [it]." *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 411 (Tenn. 2013). The Court must focus "on the evidence offered to rebut the physician's rating" in deciding if this standard has been met. *Id.*

PC Metro offered evidence from Dr. Hauge and Dr. Hazlewood to dispute Dr. Uzzle's rating on two points: (1) whether Mr. Barnett suffers from radiculopathy as described in the Guides to justify his placement beyond Class 1 of Table 17-4; and, (2) whether Class 4 applies to Mr. Barnett, since he did not have multiple herniations, and Class 4 should be reserved for only the worst cases. The Court will consider each issue to determine if the offered evidence is sufficient to leave "no serious or substantial doubt" about the incorrectness of Dr. Uzzle's rating.

Four doctors have provided detailed opinions regarding Mr. Barnett's impairment. When weighing expert opinions, the Court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Bass v. The Home Depot U.S.A, Inc.*, 2017 TN Wrk. Comp. App. Bd. LEXIS 36, at *9 (May 26, 2017).

Here, all the doctors are well-qualified. Drs. Uzzle, Kennedy, and Hazlewood are all MIRR doctors trained in providing impairment ratings. Dr. Kennedy is an orthopedist and certified as an independent medical examiner. Through the Bureau, Dr. Hazlewood has provided training to other doctors in using the Guides for the last several years. While Dr. Hauge has not received formal training in the Guides, he is a practicing neurosurgeon with years of experience providing impairments. He also had the advantage of being Mr. Barnett's treating surgeon. The Court finds that none of the doctors holds an advantage when assessing the weight of their testimony.

The Court now addresses radiculopathy. The undisputed expert testimony is that Mr. Barnett suffered a disc herniation at L4-5 that caused left-sided radiculopathy before surgery, thus meeting the first criteria for impairment under the "motion segment lesion" category of Table 17-4 of the Guides. The experts also agree that Mr. Barnett did not exhibit any signs of radiculopathy after surgery other than complaints of numbness and tingling in his legs. Where the doctors disagree is whether the radiculopathy resolved after surgery, and if not, whether it is bilateral.

Dr. Uzzle's report states that Mr. Barnett suffered from bilateral radiculopathy. This diagnosis was based on Mr. Barnett's history and sensory exams, which included

9

"monofilament, light touch, and sharp sensation testing" that showed a mild sensory decrease in the top of both feet along the L5 dermatome. Dr. Kennedy testified his sensory deficit testing was consistent with Dr. Uzzle's.

Dr. Hauge believed Mr. Barnett's radiculopathy resolved after surgery, as did Dr. Hazlewood. But Dr. Hazlewood went further by stating that even if the findings described by Dr. Uzzle and Dr. Kennedy were accurate, they still would not meet the definition of radiculopathy under the Guides, since Mr. Barnett could differentiate between sharp versus dull sensations.

In contrast, Dr. Kennedy believed that since Mr. Barnett reported sensory deficits along the expected dermatomes, this was sufficient to meet the definition of radiculopathy under the Guides.

Reviewing the Guides, the definition of radiculopathy lacks specificity. For example, the Guides do not say that subjective reports of sensory changes "must" be supported by other findings of radiculopathy; it says they "should." Further, when defining "non-verifiable radicular complaints," the Guides do not state that the party must not be able to differentiate between sharp and dull sensations. It simply states that if the sharp versus dull sensation is "preserved," the employee's symptoms may be characterized as non-verifiable radicular complaints. However, it does not clarify whether "preserved" means normal, or simply present though diminished.[3]

Finally, Mr. Barnett's testimony must also be considered. All the doctors who testified found Mr. Barnett credible, without any evidence of malingering or symptom magnification. The Court agrees. Mr. Barnett was a candid, credible witness, who provided balanced testimony without exaggeration. At trial, he testified that he continues to experience intermittent numbness in both legs, although the left leg is worse than the right. He explained that it is worsened with certain activities, such as walking for some distance or using the bathroom. The Court has no reason to doubt his truthfulness.

In *Rodgers v. Rent-A-Ctr East, Inc.*, No. W2019-01106-SC-R3-WC, 2020 Tenn. LEXIS 280, at *14 (Tenn. Workers' Comp. Panel July 29, 2020), the Supreme Court's Workers' Compensation Panel stated that "[a] disagreement between medical expert witnesses as to the proper diagnosis of an employee's condition may not, in and of itself, constitute the clear and convincing evidence needed to overcome the statutory presumption of accuracy afforded an MIR physician's impairment rating. (quoting

---

[3] PC Metro also included an excerpt from the *AMA Guides Newsletter* as an exhibit to Drs. Hauge's and Hazlewood's testimony, which the Court considered only to the extent that it was used to illustrate the doctors' opinions and not as evidence in and of itself. Nevertheless, the Court notes that, while the excerpt uses the phrase " the patient has lost sharp vs. dull discrimination" to describe ratable radiculopathy, it does not explicitly state that the deficit must be a complete inability to differentiate between the sensations.

*Mansell* at 411.) Appropriately, the issue involved was one of radiculopathy, only in *Rodgers*, the MIRR panel doctor found no evidence of radiculopathy, while the treating physician did. The Panel found that a differing diagnosis was not sufficient to overturn the MIRR panel doctor's opinion. The Court holds the same is true in this case, and PC Metro's evidence is insufficient to rebut Dr. Uzzle's opinion.

However, PC Metro also offered another argument—it was inappropriate to place Mr. Barnett in Class 4 because it requires multi-level herniations and because Mr. Barnett's condition is not severe enough for Class 4 impairments. If PC Metro can prove by clear and convincing evidence that Dr. Uzzle inappropriately applied the Guides, then it would succeed in overcoming his opinion.

Admittedly, Class 4 only describes intervertebral disc herniations "at multiple levels." However, Dr. Uzzle stated that none of the categories is a "perfect fit" for Mr. Barnett's condition of bilateral radiculopathy stemming from a single-level disc herniation. Dr. Kennedy confirmed this statement, and Dr. Hazlewood admitted the same.

Dr. Uzzle considered this issue carefully when stating in his report that Mr. Barnett could fall into either Class 2 or 4. However, he noted that Class 2 did not clarify whether it would apply if the "residual radiculopathy" were bilateral, and that Class Four was the only one that included bilateral radiculopathy in its description. Given Mr. Barnett's history, examination, and physical limitations, he felt Class 4 was the best choice for him. Since Mr. Barnett's condition did not explicitly fit any class within Table 17-4, the Court cannot hold that there is "serious and substantial doubt" as to whether Dr. Uzzle correctly applied the Guides.

Further, Dr. Hazlewood's opinion that Mr. Barnett's situation is not severe enough to warrant a Class 4 impairment is insufficient to overcome Dr. Uzzle's opinion. While the example of a Class 4 impairment in the Guides is more dire than Mr. Barnett's, that alone does not eliminate him from Class Four consideration. Both Dr. Uzzle and Dr. Kennedy thought Mr. Barnett qualified for a Class 4 rating. Dr. Hazlewood's vigorous belief otherwise is not sufficient to overcome the presumption afforded to Dr. Uzzle.

Thus, the Court holds that PC Metro did not provide clear and convincing evidence necessary to overcome Dr. Uzzle's impairment rating. The Court concludes that Mr. Barnett's vocational impairment shall be based on an anatomic impairment rating of twenty-five percent to the body as a whole.

Finally, Mr. Barnett argues that he is entitled relief under Tennessee Code Annotated section 50-6-242. However, the statute clearly states in subsection (a)(1)(A) that Mr. Barnett must be assigned at least a ten percent impairment by the "authorized treating physician." Dr. Hauge, the authorized treating physician, only assigned a seven-

or eight-percent impairment. Thus, the plain meaning of the statute prohibits an assignment of benefits beyond those in Tennessee Code Annotated section 50-6-207(3). Even if the impairment had been sufficient, the Court finds that Mr. Barnett did not prove by clear and convincing evidence, as required by section 50-6-242(a)(2), that it would be inequitable to limit his benefits to those provided under section 50-6-207(3).

Thus, Mr. Barnett is entitled to an initial award of permanent partial disability benefits based on a vocational impairment of twenty-five percent, which equates to $66,576.38. He did not return to work for PC Metro at the end of his compensation period, so Mr. Barnett is entitled to $23,301.71 in additional permanent partial disability benefits, for a total of $89,878.11. PC Metro is entitled to a credit of $7,358.99 for overpayment of temporary disability benefits and an advance against permanent partial disability benefits.

IT IS, THEREFORE, ORDERED THAT:

1. Mr. Barnett is entitled to an initial award of permanent partial disability benefits of $66,576.38 and $23,301.71 in additional benefits for a total of $89,878.11. PC Metro is entitled to a credit of $7,358.99. Thus, PC Metro shall pay Mr. Barnett $82,519.12 in a lump sum.

2. Mr. Barnett's counsel shall file a motion and affidavit for his attorney's fees. Mr. Barnett may also file a motion for reasonable litigation expenses, including but not limited to, Dr. Kennedy's witness fee and court reporter fees.

3. Dr. David Hauge shall remain Mr. Barnett's treating physician for his work-related back injury. PC Metro shall pay for reasonable, necessary, and related medical treatment for these injuries.

4. PC Metro shall pay costs of $150.00 to the Court Clerk within five business days of this order becoming final.

5. PC Metro shall file with the Court Clerk a Statistical Data Form within ten business days of this order becoming final.

6. This Compensation Order constitutes a final adjudication upon the merits of Mr. Barnett's claim for benefits. Unless appealed, it shall become final in thirty days.

**ENTERED on June 8, 2021.**

_____

**ROBERT DURHAM, JUDGE**
**Court of Workers' Compensation Claims**

**APPENDIX**

Technical Record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Stipulations of the Parties
4. Mr. Barnett's Exhibit and Witness List
5. Mr. Barnett's Supplemental Exhibit and Witness List
6. PC Metro's Amended Submissions
7. PC Metro's Exhibit List
8. PC Metro's Pre-Compensation Hearing Statement
9. PC Metro's Supplemental Pre-Compensation Hearing Statement
10. PC Metro's Compensation Hearing Brief
11. PC Metro's Clarification of Brief

Exhibits:
1. Dr. Uzzle's MIRR Report
2. Mr. Barnett's Submission of Evidence
3. Dr. Hauge's Physician Certification Form
4. Dr. Hauge's Deposition
5. PC Metro's Submission of Evidence
6. MRI Images
7. Table 17-4 from AMA Guides
8. Page 576 of AMA Guides
9. Dr. Kennedy's worksheets
10. Pain Drawing from Dr. Kennedy's Evaluation
11. Activity Sheet

**CERTIFICATE OF SERVICE**

I certify that a copy of the Order was sent as indicated on June 8, 2021.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| Ameesh Kherani | | | X | akherani@davidhdunaway.com |

| | | | | sridings@kheranilaw.com |
|---|---|---|---|---|
| Kitty Boyte | | | X | kboyte@constangy.com |
| | | | | dmccorkle@constangy.com |

_____

**PENNY SHRUM, Court Clerk**
WC.CourtClerk@tn.gov



# NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

**Statement of the Issues on Appeal**

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

**Parties**

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

LB-1099 rev. 01/20                                    Page **1** of **2**                                    RDA 11082

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

**<u>CERTIFICATE OF SERVICE</u>**

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____

*[Signature of appellant or attorney for appellant]*